UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KIMBERLY VASILESCU, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| DANBURY HOSPITAL | : | |
| | : | MARCH 4, 2021 |
| Defendant. | : | |

# COMPLAINT
## JURISDICTION AND VENUE

1. This action arises under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), codified as amended at 42 U.S.C. § 12101 *et seq*.; the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. 46a-60, *et seq*.; and Connecticut state law.

2. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Plaintiff resides in this district.

4. Supplemental jurisdiction over Plaintiff's supplemental state law claims are invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

5. Costs, expert witness fees and attorney's fees are sought pursuant to 42 U.S.C. §1988.

6. The Plaintiff received a Notice of Right to Sue on December 14, 2020.

7. The Plaintiff received a Release of Jurisdiction on December 9, 2020.

## PLAINTIFF

8. The Plaintiff, Kimberly Vasilescu ("Vasilescu" or "Plaintiff") resides at 380 Old Waterbury Road, Apt. 1, Southbury, CT 06488.

## DEFENDANT

9. The Defendant, Danbury Hospital ("Defendant" or "Danbury Hospital"), is located at 24 Hospital Avenue, Danbury, CT 06810.

10. Danbury Hospital employs more than twenty (20) employees.

## FACTUAL ALLEGATIONS

11. Danbury Hospital hired Vasilescu in June of 2007.

12. Vasilescu suffers from a disability, Attention Deficit Hyperactivity Disorder (ADHD).

13. Upon hire, Vasilescu made her employer fully aware of her disability.

14. Vasilescu always performed the duties of her position satisfactorily.

15. Then, in September of 2018, Vasilescu was transferred to the position of Reimbursement Analyst.

16. After her transfer, Vasilescu's new Supervisor became Crystal Lamincusa ("Lamincusa") (no known disability).

17. Vasilescu reminded Lamincusa of her disability when she transferred into the department, so it would not become an issue.

### A.  Lamincusa Begins to Treat Vasilescu Disparately.

18. For example, Lamincusa falsely accused Vasilescu of performance issues, other work-related issues, unfairly critiqued her, and wrote her up, as part of a pattern, plan, and scheme to get Vasilescu terminated.

19. Lamincusa also monitored Vasilescu much more closely than her co-workers.

20. Lamincusa tasked Vasilescu with unrealistic goals to complete on a daily basis that were impossible to meet every day, due to the nature of her job and given her known disability.

21. Vasilescu was the only employee tasked with such elevated expectations.

22. In fact, on one particular occasion, Lamincusa even went as far as to count FMLA as an "occurrence," when Vasilescu was out of work because of her son who had been hospitalized.

23. As a result of Lamincusa's constant harassment, on April 5, 2019, Vasilescu emailed Diane Savitsky ("Savitsky") (no known disability), the Human Resources (HR) Coordinator stating, "can I come and talk to someone up there in HR.  I am not sure who I would speak to but if there is someone that I can schedule an appointment with I would like to."

24. Vasilescu wanted to meet with HR to discuss recent events of being unfairly written-up by Lamincusa, issued warnings, falsely accused of using her cellular phone during working hours, and being chastised for arriving one minute late to work, which Lamincusa did not subject other employees to the same level of scrutiny.

**B. Lamincusa Retaliates Against Vasilescu After Her Complaint to Human Resources**.

25. After her formal complaint, Vasilescu noticed a drastic change in her work environment and noticed, even more, that she was being singled out by Lamincusa.

26. Vasilescu was hoping to come up with a positive solution to manage this and work together toward a common goal and understanding.

27. Accordingly, on May 20, 2019, Vasilescu emailed Savitsky again stating, "I was wondering if there was any I can come and speak to someone. I am not sure if Katherine has anytime available because I know she is busy but I definitely would like to meet with someone to express some issues I am having."

28. Vasilescu wanted to discuss similar issues to the issues she was having back in April 2019, which HR failed to remedy. After discussing her concerns with HR in April of 2019, HR only suggested that Vasilescu "keep strong communication" with Lamincusa, and notify Lamincusa of all her activities and try to "work with Lamincusa."

29. Aside from the recurring issues Vasilescu was encountering, Lamincusa now began to attack her performance and productivity and began setting impossible goals for Vasilescu to meet.

30. In addition, management was not assisting or accommodating Vasilescu when her son was sick and she had to take him to necessary medical appointments which she had documentation for; instead, Vasilescu was written-up for it.

31. Extremely fearful, on May 21, 2019, Vasilescu emailed Savitsky in HR again inquiring, "do I have to let anyone know who I am meeting with?"

32. Finally, Vasilescu was able to meet with Kathryn Cullinan ("Cullinan") (no known disability), HR Director.

33. After's meeting with Cullinan, on May 31, 2019, Vasilescu emailed Cullinan, stating: "I just wanted to thank you again for meeting with me. I would like to keep our meeting confidential because I do not know what Crystal[] [Lamincusa's] reaction would be. I do not want any more issues if she found out I went to HR."

34. The purpose of the meeting was to again discuss the recurring issues Vasilescu had been having with Lamincusa, discussions she previously had with Savitsky, and her feeling that the situation was becoming worse because management was not adequately addressing the situation.

35. Vasilescu was hoping to obtain advice on what to do and how to handle the situation with Lamincusa which was becoming worse daily.

36. Cullinan advised Vasilescu to meet with Lamincusa to discuss these issues and come to an understanding, but Vasilescu was not getting the necessary support from HR who had been not adequately addressed her concerns, leaving it up to Vasilescu, instead of HR discussing it with Lamincusa.

37. On June 5, 2019, Vasilescu emailed Cullinan stating, "… I had a long discussion with Crystal on Friday 5/30/2019 and I will contact you or schedule another meeting if any issues arise going forward."

38. On July 30, 2019, Vasilescu emailed Lamincusa stating, "if you can remember [to] touch base with Maureen upon her return to see about working with my schedule so

[I] can have a day off during the week as I will need to put [my son] Jacob in daycare come September and can't afford to put him in full time."

39. In or about August 2019, although Vasilescu's employer already knew about her disability, she followed up with HR on several occasions regarding her disability.

40. Specifically, Vasilescu complained to Savitsky, HR Coordinator, that **she had a learning disability** and due to her disability, she could not meet her manager's expectations. Vasilescu also informed HR that she felt as though she was being **singled out** by Lamincusa.

41. During Vasilescu's meeting with HR, she also requested — as a reasonable accommodation — that her hours be modified to take care of her son and make sure he attends necessary medical appointments.

42. On August 6, 2019, Vasilescu received an email from Lamincusa stating, regarding your request to reduce or change your hours … we cannot accommodate your request …."

43. Although Lamincusa refused to accommodate Vasilescu, in contrast, other employees in the department were approved of this shortly after and permitted to reduce and/or change their hours, even though Defendant told Vasilescu that it cannot due to the department and hours needed.

44. Attempting to seek an accommodation, following Vasilescu's meeting with HR, on August 7, 2019, she emailed Savitsky and stated, "really appreciate you talking with me yesterday…. I have 12 years with this company and would like to try and work something out and come up with a solution. My job is important to me but so is my

son. I have coverage for him on Mondays and can only put him in a daycare 3 days a week so I am flexible with any of the other days."

45. On October 23, 2019, Vasilescu attempted to transfer to another department in a desperate hope to be treated fairly.

46. Vasilescu sought a transfer to the position of Scheduler B in the Physicians' Office.

47. On October 24, 2019, Vasilescu emailed Savitsky stating, "I know we just spoke but wanted to know if I should be speaking to someone else in regards to my [transfer]?"

48. That same day, October 29, 2019, Vasilescu received an email from Defendant deeming her "ineligible for transfer," despite the fact that she had worked in the department for over a year and was in fact, eligible for a transfer.

49. On that same day, October 29, 2019, unable to obtain any resolution from HR, Vasilescu requested a meeting with Kathleen Lant ("Lant") (no known disability) (HQ) to discuss her unaddressed various workplace issues, inclusive of Lamincusa's constant unchecked harassment against her.

50. On October 30, 2019, Vasilescu received an email from Lant (HQ) summarizing her concerns.

51. Ms. Lant's email never indicated any plan or action to attempt to accommodate Vasilescu, address any of the issues she was having with Lamincusa, or engage in any good-faith interactive dialogue.

**C. With No Assistance From Human Resources, the Disparate Treatment by Lamincusa Persisted.**

52. On November 11, 2019, Vasilescu was formally placed on a Performance Improvement Plan (PIP) by Lamincusa, despite many prior attempts to seek work-

related assistance, and after Vasilescu had requested a transfer, in desperation to not work with Lamincusa.

53. Towards the end of Vasilescu's employment, she was given four weeks to clear worklists that were also impossible. This ensured Vasilescu would not be able to complete her goals during the PIP period.

54. On December 6, 2019, Lamincusa's plan came to fruition and she terminated Vasilescu from her position for purportedly "not meeting expectations."

## COUNT ONE

### DISABILITY DISCRIMINATION, IN VIOLATION OF THE ADAAA

55. Plaintiff hereby incorporates Paragraphs 1-54 with the same force and impact as if fully set forth herein.

56. Plaintiff suffers from Attention Deficit Hyperactivity Disorder (ADHD).

57. Upon hire, Vasilescu made her employer fully aware of her disability.

58. Danbury Hospital discriminated against the Plaintiff and treated her in a disparate manner in the terms and conditions of her employment based upon her disability, including, but not limited to the following:

   (a) Failing to engage in the ADAAA mandatory "interactive process" to "identify and implement appropriate reasonable accommodations;

   (b) Unfairly critiquing Plaintiff and writing her up;

   (c) Giving Plaintiff unrealistic goals;

   (d) On October 29, 2019, denying Plaintiff a transfer;

   (e) On November 11, 2019, placing the Plaintiff on a Performance Improvement Plan; and

(f) On December 6, 2019, terminating the Plaintiff's employment.

59. Defendant's actions were taken because the Plaintiff had a disability.

60. Plaintiff's actions are in violation of the ADAAA.

61. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

62. Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT TWO

### DISABILITY DISCRIMINATION,
### IN VIOLATION OF CONN. GEN. STAT. § 46A-60(b)(1)

63. Plaintiff hereby incorporates Paragraphs 1-62 with the same and impact as if fully set forth herein.

64. Defendant's actions are in violation of Conn. Gen. Stat. § 46a-60(b)(1).

65. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

66. Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT THREE

### RETALIATION,
### IN VIOLATION OF THE ADAAA

67. Plaintiff hereby incorporates Paragraphs 1-62 with the same force and impact, as if

fully set forth herein.

68. Plaintiff suffers from Attention Deficit Hyperactivity Disorder (ADHD).

69. Upon hire, Vasilescu made her employer fully aware of her disability.

70. Plaintiff was treated disparately due to her disability.

71. Thereafter, she engaged in protected activity several times to complain about Lamincusa's retaliatory conduct.

72. On April 5, 2019, Vasilescu emailed Diane Savitsky (no known disability), Human Resources (HR) Coordinator to address the harassment she had been receiving from Lamincusa.

73. Plaintiff was retaliated against by being unfairly written-up by Lamincusa, issued warnings, falsely accused of using her cellular phone during working hours, and being chastised for arriving one minute late to work, which Lamincusa did not subject other employees to the same level of scrutiny.

74. On May 20, 2019, Plaintiff contacted HR to complain of retaliation and of more issues with her supervisor, Lamincusa, similar to the issues she was having back in April 2019, which HR failed to remedy.

75. On or about May 31, 2019, Vasilescu met with Kathryn Cullinan (no known disability), HR Director to discuss the recurring issues Vasilescu had been having with Lamincusa, discussions she previously had with Savitsky, and her feeling that the situation was becoming worse because management was not adequately addressing the situation.

76. In or about August 2019, although Vasilescu's employer already knew about her disability, she followed up with HR on several occasions regarding her disability.

77. Specifically, Vasilescu complained to Savitsky, HR Coordinator, that **she had a learning disability** and due to her disability, she could not meet her manager's expectations. Vasilescu also informed HR that she felt as though she was being **singled out** by Lamincusa.

78. After engaging in protected activity, Vasilescu was subjected to retaliation in one or more of the following ways:

    (a) Unfairly critiquing Plaintiff and writing her up;

    (b) Giving Plaintiff unrealistic goals;

    (c) On October 29, 2019, denying Plaintiff a transfer;

    (d) On November 11, 2019, placing the Plaintiff on a Performance Improvement Plan; and

    (e) On December 6, 2019, terminating the Plaintiff's employment.

79. Defendant's actions were taken in retaliation for Plaintiff engaging in protected activity and lodging formal complaints against her supervisor.

80. Plaintiff's actions are in violation of the ADAAA.

81. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

82. Plaintiff is seeking damages as a result of Defendant's unlawful conduct

## COUNT FOUR

### RETALIATION,
### IN VIOLATION OF CONN. GEN. STAT. §46A-60(b)(4)
### - BASED UPON DISABILITY

83. Plaintiff hereby incorporates Paragraphs 1-62, 67-82 with the same force and impact, as if fully set forth herein.

84. Defendant's actions are in violation of Conn. Gen. Stat. §46a-60(b)(4).

85. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages that include, but are not limited to: lost or reduced wages, fringe benefits, health insurance benefits, and pension payments; emotional and psychological distress, stress, anxiety; physical injury; and the loss of the ability to enjoy life's pleasures and activities.

86. Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT FIVE

### DISCRIMINATION BASED UPON SINGLE PARENT MARITAL STATUS,
### IN VIOLATION OF CONN. GEN. STAT §46A-60(B)(1)

87. Plaintiff hereby incorporates Paragraphs 1-62 with the same force and impact as if fully set forth herein.

88. Defendant harassed, discriminated against Plaintiff, and terminated her employment due to her single-parent marital status.

89. Management was not assisting or accommodating Vasilescu when her son was sick and she had to take him to necessary medical appointments which she had documentation for; instead, Vasilescu was written-up for it.

90. On July 30, 2019, Vasilescu emailed Lamincusa stating, "if you can remember [to] touch base with Maureen upon her return to see about working with my schedule so [I] can have a day off during the week as I will need to put [my son] Jacob in daycare come September and can't afford to put him in full time."

91. During Vasilescu's meeting with HR, she also requested — as a reasonable accommodation — that her hours be modified in order to take care of her son and make sure he attends necessary medical appointments.

92. On August 6, 2019, Vasilescu received an email from Lamincusa stating, regarding your request to reduce or change your hours … we cannot accommodate your request …."

93. While Lamincusa refused to accommodate Vasilescu, in contrast, other employees in the department were approved of this shortly after and permitted to reduce and/or change their hours, even though Defendant told Vasilescu that it cannot due to the department and hours needed.

94. Attempting to seek an accommodation, following Vasilescu's meeting with HR, on August 7, 2019, she emailed Savitsky and stated, "really appreciate you talking with me yesterday…. I have 12 years with this company and would like to try and work something out and come up with a solution. My job is important to me but so is my son. I have coverage for him on Mondays and can only put him in a daycare 3 days a week so I am flexible with any of the other days."

95. Plaintiff and treated her in a disparate manner in the terms and conditions of her employment based upon her single parent marital status, including, but not limited to

the following:

    (a) Being unfairly critiqued and written up;

    (b) Giving Plaintiff unrealistic goals;

    (c) On October 29, 2019, denying Plaintiff a transfer;

    (d) On November 11, 2019, placing the Plaintiff on a Performance Improvement Plan; and

    (e) On December 6, 2019, terminating the Plaintiff's employment.

96. Defendant's conduct is unlawful and in violation of Conn. Gen. Stat. §46a-60(b)(1).

97. As a result of the Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress, and the ability to enjoy life's pleasures.

98. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

## COUNT SIX

### RETALIATION, BASED UPON SINGLE PARENT MARITAL STATUS, IN VIOLATION OF CONN. GEN. STAT §46A-60(B)(4)

99. Plaintiff hereby incorporates Paragraphs 1-62 and 87-98 with the same force and impact as if fully set forth herein.

100. Plaintiff engaged in protected activity by requesting that her hours be modified so that she could take care of her son and make sure he attends necessary medical appointments.

101. Plaintiff further stated that her "job is important to me but so is my son. I have coverage for him on Mondays and can only put him in a daycare 3 days a week so I am flexible with any of the other days."

102. Plaintiff and retaliated against for engaging in protected activity based upon her single parent marital status, including, but not limited to the following:

    (a) Being unfairly critiqued and written up;

    (b) Giving Plaintiff unrealistic goals;

    (c) On October 29, 2019, denying Plaintiff a transfer;

    (d) On November 11, 2019, placing the Plaintiff on a Performance Improvement Plan; and

    (e) On December 6, 2019, terminating the Plaintiff's employment.

103. Defendant's conduct is unlawful and in violation of Conn. Gen. Stat. §46a-60(b)(4).

104. As a result of the Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress, and the ability to enjoy life's pleasures.

105. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

**PRAYER FOR RELIEF**

    Wherefore the Plaintiff prays that this court award:

    1. Money damages;

    2. Costs;

    3. Punitive damages, attorney fees, and expert witness fees;

4. Pre-judgment interest

5. Trial by jury; and

6. Such other relief as the Court deems just, fair, and equitable.

                THE PLAINTIFF,
                KIMBERLY VASILESCU


By: _____/s/_____
    Michael C. McMinn (#ct267169)
    **THE MCMINN EMPLOYMENT LAW FIRM, LLC**
    1000 Lafayette Blvd., Suite 1100
    Bridgeport, CT 06604
    Tel: (203) 683-6007
    Fax: (203) 680-9881
    michael@mcminnemploymentlaw.com

    *COUNSEL FOR PLAINTIFF*